Aracelis MONTALVO, Plaintiff,

v.

Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.

No. 02–CV–0494E(F).

United States District Court,
W.D. New York.

Oct. 6, 2006.

Neighborhood Legal Services, Inc., Alan B. Block, of Counsel, Buffalo, NY, for Plaintiff.

Kathleen M. Mehltretter, Acting United States Attorney, Jane B. Wolfe, and Kevin D. Robinson, Assistant United States Attorneys, of Counsel, Buffalo, NY, for Defendant.

MEMORANDUM and ORDER[1]

ELFVIN, Senior District Judge.

## INTRODUCTION

On July 11, 2002 petitioner, Aracelis Montalvo ("Montalvo") initiated this action pursuant to Title XVI of the Social Security Act, seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her claim for supplemental security income benefits ("SSI"). The matter was referred to Magistrate Judge Foschio, by Order dated November 20, 2002 (Dkt.# 6), to make a determination of the merits of the factual and legal issues presented and for the prepara-

[1]. This decision may be cited in whole or in any part.

tion and filing of a Report and Recommendation as to disposition. On June 16, 2003, the Commissioner filed a motion for judgment on the pleadings (Dkt.# 14). On August 25, 2003, Montalvo also filed a motion for judgment on the pleadings (Dkt.# 17).

On December 21, 2005, Magistrate Judge Foschio issued a Report and Recommendation ("R & R") recommending that the Commissioner's motion be denied, Montalvo's motion be granted and the matter be remanded for calculation of benefits (Dkt.# 19). Specifically, the R & R found that the Administrative Law Judge's ("ALJ") determination that plaintiff is not disabled violated the treating physician rule as the ALJ's reasons for rejecting the opinions rendered by plaintiff's treating physician are not supported by substantial evidence in the record.

The Commissioner filed objections to the R & R on January 4, 2006 (Dkt.# 20), claiming that the ALJ appropriately weighed the evidence and properly concluded that plaintiff's mental condition did not preclude her ability to perform all work-related activities. In the alternative, the Commissioner contends that, if the Court were to find that the ALJ did not properly weigh the evidence, the matter should be remanded for further administrative proceedings rather than merely calculation of benefits. In response (Dkt.# 21), plaintiff claims that the R & R was correct in its findings and further administrative proceedings on the issue of disability would be pointless.

### DISCUSSION

Familiarity with the R & R is presumed. The R & R correctly states that

"[t]he standard of review for courts reviewing administrative findings regarding disability benefits, 42 U.S.C. §§ 401–34 and 1381–85, is whether the administrative law judge's findings are supported by substantial evidence. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Substantial evidence requires enough evidence that a reasonable person would 'accept as adequate to support a conclusion.' *Consolidated Edison Co. v. National Labor Relations Board,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)."

R & R at p. 23; *see also Melville v. Apfel,* 198 F.3d 45, 51–52 (2d Cir.1999) ("[C]ourts are [required] to uphold the decision unless it is not supported by substantial evidence or is based on an error of law.").

Montalvo's 1999 application for SSI benefits, twice denied, went to administrative hearing on May 11, 2000. In her application for benefits, Montalvo claimed disability due to diabetes, depression, insomnia, a thyroid condition, blood circulation and back problems. She claimed that the medications prescribed for her numerous conditions make her too tired to work, that her back problems caused her to stop work in 1985 [2] and that she has not worked since. It is undisputed that Montalvo (age 40 with a GED from Puerto Rico at the time of her application) suffers from numerous physical impairments including diabetes, insomnia, hypothyroidism, back and neck and left elbow pain, varicose veins, and depression. At that time, Montalvo's medications included Paxil, Zoloft, Hydroxyzine, Trazadone, Synthriod, Flonase, low-dosage aspirin and ibuprofen. It is the extent of her depression and mental/emotional impairments that was central to the denial of benefits and subsequent hearing.

---

**2.** Montalvo's only work experience outside the home was briefly as a housekeeper, which she ceased doing in 1985 due to her back problems and emotional 'nervousness'.

Montalvo had been in continuing treatment for mental health issues since 1998—first with psychiatrist Dr. Cartagena, then with Dr. Hernandez. In addition to and in connection with her disability application, Montalvo was examined by various doctors hired by the Social Security Administration. The Administration's consulting physician diagnosed Montalvo with depression, diabetes, leg pain (probably muscular), hypothyroidism and low back pain (possibly osteoarthritis). His prognosis was "fair", stating that Montalvo could probably work in a non-stressful environment where no heavy lifting was required. The administration's consultive psychologist, however, diagnosed Montalvo with major depression with psychotic features, panic disorder with agoraphobia and obsessive compulsive disorder, stating that "it is unrealistic to expect [Montalvo] to be competitively employed at this point in time ... her psychological impairment is too severe * * *". A review psychologist also diagnosed major depression with psychotic features which brought about disturbances of mood accompanied by full or partial manic or depressive syndrome. Anxiety disorders such as panic disorder with agoraphobia and obsessive-compulsive disorder were also confirmed.

The application for benefits was denied in May 1999, but Montalvo applied for reconsideration in July 1999, stating that her condition had worsened since her initial filing. Additional information was gathered and presented at a hearing on May 11, 2000. The ALJ issued his decision denying Montalvo benefits on July 28, 2000. An Appeals Council review was requested and additional evidence and argument submitted relative thereto on February 6, 2002 and April 9, 2002. On July 26, 2002, the review request was denied.

The R & R contains a detailed examination and analysis of the evidence presented to the ALJ and concludes that the ALJ's determination violated the treating physician rule[3] in that the ALJ's reasons for rejecting the opinions rendered by Montalvo's treating physician were not supported by substantial evidence in the record.[4] The Commissioner objects to this finding and argues that the ALJ's reasons for not accepting the treating physician's opinion were valid.

The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate" and may adopt those parts of the R & R to which no specific objection is raised, so long as such are not clearly erroneous. 28 U.S.C. § 636(b)(1)(C); *Black v. Walker*, 2000 WL 461106, at *1 (W.D.N.Y.2000). With respect to those portions of the R & R to which specific objections have been

---

**3.** The opinion of the treating physician is to be given controlling weight if it is supported by medically acceptable techniques and results from frequent examinations, and is supported by the administrative record. *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir.1993); 20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d). The treating physician's opinion is given greater weight because of the "continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient." *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n. 2 (2d Cir.1983).

**4.** The Commissioner need not give controlling weight to the treating physician's opinion if the opinion is not supported by substantial evidence in the record. *Diaz v. Shalala*, 59 F.3d 307, 313 (2d Cir.1995). However, the ALJ cannot arbitrarily substitute his or her own judgment in place of competent and supported medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir.1999). Further, the regulations require an explanation as to why the treating physician's opinion is not credited. *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The failure to provide such explanation is a ground for remand. *Ibid.*

made, a *de novo* review is required. 28 U.S.C. § 636(b)(1)(C); *United States v. Raddatz,* 447 U.S. 667, 675–676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980); *Sieteski v. Kuhlmann,* 2000 WL 744112, at *1 (W.D.N.Y.2000). In practice, Rule 72(b) of the Federal Rules of Civil Procedure (F.R.Cv.P.) requires that "specific written objection be made" by the party and a *de novo* determination by the Court as to those portions of the R & R "to which specific written objection has been made in accordance with this rule." Further, Objections to an R & R in this District must comply with the Local Rules of Civil Procedure (L.R.Cv.P.). L.R.Cv.P. 72.3(a)(3) states in pertinent part that:

> " * * * objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."

Other than arguing that the ALJ's reasons *were* supported by substantial evidence while the Magistrate Judge found that they *were not,* the objections contain no argument pointing to *specifically why* the R & R was wrong. For example, no error of law is alleged; there are no facts found or relied upon in the R & R which are argued to be improperly found or relied upon; there is no argument that an improper standard of review was applied. A review of the record indicates that the argument in the Commissioner's objections is precisely the same as presented to the Magistrate Judge. This Court has stated on numerous occasions that "a proceeding before the Magistrate Judge is not a meaningless dress rehearsal". *Wooten v. Barnhart,* No. 05–CV–0084E(Sc) (08/29/06); *Dennard v. Kelly,* 1997 WL 9785 (W.D.N.Y.1997); *Klawitter v. Chater,* 1995 WL 643367 (W.D.N.Y.1995). The Commissioner's objections are merely an attempt at gaining a 'second bite at the apple' simply because she would like it to be decided a different way, not because there was something specifically wrong with the way the Magistrate has already decided it. *See Camardo v. Gen. Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 381–382 (W.D.N.Y.1992). This is not the "specific objection" "supported by legal authority" as contemplated by F.R.Cv.P. 72 or the Local Rules and, as such, the R & R need only be reviewed for clear error. *See Barratt v. Joie,* 2002 WL 335014, at *1 (S.D.N.Y.2002) (citing, *inter alia, Camardo* in finding that "[w]hen a party ... simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error.")

After a review of the record and the R & R, the Court finds no clear error in any of Judge Foschio's findings of fact or conclusions of law. The evidence considered by Judge Foschio was detailed and thorough and the rationale presented in support of his findings was well-supported and correct.[5] Viewing the record as a whole, the Court finds that the ALJ's determination that Montalvo was not disabled was supported by only slight, clearly not substantial, evidence. Further, because the opinion of the treating physician so clearly supports a finding of disability and because remand would require that great weight be given this opinion, any remand herein for further evidentiary findings regarding proof of disability would serve no purpose. *See Parker v. Harris,* 626 F.2d 225, 235 (2d Cir.1980)(when the record provides persuasive proof of disability, a

---

5. The Court further finds that, notwithstanding the foregoing, the Court has made a *de novo* review of the record and finds that it also supports an adoption of Judge Foschio's R & R.

remand for further evidentiary proceedings would serve no purpose and an order that benefits be paid is appropriate).

Accordingly, it is hereby **ORDERED** that the Commissioner's objections are overruled, that the R & R is adopted in its entirety. That the Commissioner's motion for judgment on the pleadings (Dkt.# 14) is **DENIED,** Montalvo's motion for judgment on the pleadings (Dkt.# 17) is **GRANTED** and this case shall be remanded for calculation and payment of benefits.

## REPORT and RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

### *JURISDICTION*

This case was referred to the undersigned by Honorable John T. Elfvin on November 20, 2002, for a Report and Recommendation on the merits of the action. The matter is presently before the court on motions for judgment on the pleadings filed by Defendant on June 16, 2003 (Doc. No. 14), and by Plaintiff on August 25, 2003 (Doc. No. 17).

### *BACKGROUND*

Plaintiff Aracelis Montalvo seeks review of the Commissioner's decision denying her Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act ("the Act"). In denying Plaintiff's application for benefits, the Commissioner determined that although Plaintiff has not, since March 18, 1999, engaged in substantial gainful activity and suffers from severe impairments "which significantly limit her ability to perform basic work activities such as lifting and carrying," (R. 23),[1] Plaintiff does not have an impairment or combination of impairments within the Act's definition of impairment. (R. 31). The Commissioner further determined that Plaintiff's claims regarding the totally disabling effects of Plaintiff's impairments are not credible in light of the entire record. (R. 31). Although the Commissioner found Plaintiff was unable to perform any past relevant work, the Commissioner determined that Plaintiff retained the residual functional capacity for medium work, although reduced by a moderate limitation in her ability to understand, remember and follow complex and detailed instructions, to sustain attention and concentration for long periods of time, or to interact with the public or work in coordination with others, including co-workers. (R. 31–32). As such, Plaintiff was found not disabled, as defined in the Act, at any time through the date of the Administrative Law Judge's decision. (R. 32).

### *PROCEDURAL HISTORY*

Plaintiff filed an application SSI benefits on March 18, 1999, alleging she was disabled as of December 9, 1994. (R. 105–09). The application was initially denied on May 14, 1999 (R. 75–79), and, upon reconsideration, on August 19, 1999. (R. 82–88). Pursuant to Plaintiff's request filed October 14, 1999 (R. 89–90), on May 11, 2000, an administrative hearing was held before Administrative Law Judge Timothy McGuan ("the ALJ"), at which time Plaintiff, represented by Bruce Caufield ("Caufield"), a staff paralegal with Neighborhood Legal Services, Inc. ("NLS"), appeared and testified. (R. 40–72). Amy Laura, a Spanish/English interpreter, interpreted for Plaintiff, who speaks only Spanish. (R. 40, 42). Testimony was also given by Vocational Expert

---

**1.** "R." references are to the page numbers of the administrative record submitted in this case for the court's review.

Timothy Janikowski, Ph.D. (R. 61–70). On July 28, 2000, the ALJ found Plaintiff was not disabled. (R. 21–33).

On August 17, 2000, Plaintiff requested review of the hearing decision by the Appeals Council. (R. 17–18). In support of the requested review, Caufield, by letter dated February 6, 2002, summarized Plaintiff's challenges to the ALJ's decision. (R. 12–15). Plaintiff subsequently submitted additional evidence concerning her request for review, including a letter dated April 9, 2002 from Plaintiff's treating psychiatrist (R. 308–09), and another letter written by Caufield, dated April 19, 2002 (R. 310). On May 14, 2002, the Appeals Council, upon considering Plaintiff's request for review of the ALJ's hearing decision, the record, and Caufield's February 6, 2002 letter, denied the request for review. (R. 9–11). In light of Plaintiff's recently submitted evidence, however, the Appeals Council, on July 26, 2002, vacated its May 14, 2002 decision denying Plaintiff's request for review. (R. 5–7, 8). Nevertheless, upon reconsidering Plaintiff's request for review, including the record and recently submitted evidence, the Appeals Council, on July 26, 2002, again found no basis for granting the review and denied the request, thereby rendering the ALJ's hearing decision the final decision of the Commissioner. (R. 5–7, 8). This action followed on July 11, 2002.

By order filed January 9, 2003 (Doc. No. 9), Defendant was given until March 7, 2003 to file an answer. Defendant's answer to the Complaint, filed on March 5, 2003 (Doc. No. 10), was accompanied by the attached record of the administrative proceedings. Defendant filed a Supplement to the Answer (Doc. No. 11) ("Answer Supplement"),[2] on March 24, 2003. On June 16, 2003, Defendant filed a motion for judgment on the pleadings and a Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings (Doc. No. 15) ("Commissioner's Memorandum"). On August 25, 2003, Plaintiff filed a motion for judgment on the pleadings, and a Memorandum of Law (Doc. No. 18) ("Plaintiff's Memorandum") in support. Oral argument was deemed unnecessary.

Based on the following, Defendant's motion for judgment on the should be DENIED; Plaintiff's motion for judgment on the pleadings should be GRANTED insofar as it seeks remand for calculation of benefits, and the matter should be remanded for calculation of benefits.

## FACTS[3]

Plaintiff Aracelis Montalvo ("Plaintiff"), was born on June 15, 1959 and attended school in Puerto Rico until the ninth grade, earning a high school graduate equivalency diploma in Puerto Rico in 1987. (R. 48, 107, 120). Plaintiff speaks and under-

---

**2.** The Answer Supplement contains p. 302 of the Administrative Record.

**3.** The Facts statement is taken from the pleadings, administrative record and motion papers filed in this action. Because Plaintiff applied for disability benefits based on numerous physical impairments in addition to her mental impairment, but in this action argues only that the ALJ improperly discredited Plaintiff's treating psychiatrist's opinion that Plaintiff is unable to work, and failed to render a specific finding as to whether Plain-

tiff is "emotionally able to work away from home," Plaintiff's Memorandum at 13–18, in this Report and Recommendation, only those facts relevant to those issues are discussed in detail. The court notes, however, that Plaintiff has been diagnosed with certain endocrine diseases, including diabetes mellitus and hypothyroidism, lateral epicondylitis (tendinitis or "tennis elbow") of the left elbow which is an orthopedic disorder, and asthma; the presence of those conditions is not disputed.

stands only Spanish and can neither read nor write in English. (R. 113, 125, 129, 134, 135). Plaintiff suffers from numerous physical impairments including diabetes, insomnia, hypothyroidism, back, neck and left elbow pain, varicose veins, and depression. (R. 24, 114). Plaintiff's only work experience outside the home has been as a housekeeper in 1984 and 1985. (R. 48, 114–15, 128, 143). Back problems and nervousness caused Plaintiff to stop working in 1985. (R. 114, 128).

Plaintiff began receiving routine health maintenance at Niagara Family Medical Center ("Niagara Family"), located in Buffalo, New York, in January 1997, when Plaintiff complained of enduring fatigue for more than one month, and daily dizziness. (R. 219). On August 28, 1997, Plaintiff was diagnosed with new onset type II diabetes, hypothyroidism and varicose veins. (R. 213–16). Plaintiff continued to receive treatment from Niagara Family for these conditions through the date of Plaintiff's administrative hearing. (R. 262–81).

Plaintiff first sought mental health treatment on December 17, 1998 with Lower West Side Counseling Services ("Lower West Side Counseling") at Lake Shore Behavioral Health ("Lake Shore") upon referral from her primary physician at Niagara Family. (R. 231–34, 294). Upon initial assessment, Plaintiff presented with issues of irritability, anger, self-isolation, depressed mood, anxiety, disturbed sleep and appetite. (R. 220–34). Plaintiff was diagnosed with dysthmic disorder and personality disorder not otherwise specified. (R. 294). Plaintiff was initially treated by psychiatrist Maria Cartagena, M.D. ("Dr.Cartagena"), (R. 220–30), and later by psychiatrist Concepcion Hernandez, M.D. ("Dr.Hernandez").

(R. 290–95, 308–09). The mental health treatment Plaintiff received at Lower West Side Counseling included supportive counseling and prescription medication, including the antidepressant Zoloft. (R. 220–34).

On March 18, 1999, Plaintiff filed an application SSI benefits alleging that since March 1997,[4] she has been disabled by diabetes, depression, insomnia, a thyroid condition, blood circulation and back problems. (R. 105–22). Plaintiff further stated that the medications prescribed for her illnesses make her too tired to work, that back problems caused her to stop working in 1985, and that she has not worked since. (R.114). Plaintiff described her only employment as cleaning houses, a job which required her to move appliances to clean, lift 50 pounds on occasion and frequently lift 10 pounds, and also required her to walk, stand, sit, climb, stoop, knee, crouch, crawl, and handle, grab or grasp big objects. (R. 115). At that time, Plaintiff's medications included Ibuprofen (non-steroidal anti-inflammatory medication), Paxil (antidepressant), Zoloft (antidepressant), Trazadone (for insomnia), low-dosage aspirin, Hydroxyzine (anti-anxiety medication), and synthroid (thyroid medication). (R. 116). Plaintiff also attended mental health counseling sessions for depression. (R.116).

On April 15, 1999, Plaintiff was examined in connection with her disability benefits application by Jorge Pardo, M.D. ("Dr.Pardo"), a consultative physician for the SSA. (R. 147–48, 152–53). At that time, Plaintiff's complained of depression, diabetes mellitus, tingling sensations in her legs and feet caused by circulation problems, hypothyroidism, and low back pain. (R. 147). Plaintiff denied smoking

---

4. Plaintiff did not further specify her alleged disability onset date. (*See* R. 114 (specifying

impairments first bothered Plaintiff on "3/XX/97")).

or abusing any drugs or alcohol. (R. 147). Plaintiff reported to Dr. Pardo that her typical daily activities included such household chores as washing, cleaning and cooking and that she shopped for groceries once a month. (R. 147). After examining Plaintiff, Dr. Pardo diagnosed depression, diabetes mellitus controlled by diet, lateral leg pain possibly muscular in origin, hypothyroidism and low back pain possibly caused by osteoarthritis. (R. 148). Dr. Pardo's prognosis was "fair" and he opined that Plaintiff could work in a non-stressful environment at a job that did not require any heavy lifting. (R. 148).

Plaintiff also underwent on April 15, 1999, an evaluation by SSA consultative psychologist M. Cheryl Butensky, Ph.D. ("Dr.Butensky"). (R. 149–51). Dr. Butensky reported that Plaintiff was accompanied to the appointment by a friend, who also served as an English translator, and that Plaintiff "is too nervous to go anywhere by herself and will not get on buses." (R. 149). Dr. Butensky's report was based on the April 15, 1999 interview and Plaintiff's own assertions. (R. 149). According to Dr. Butensky, Plaintiff reported her current medications as Trazadone, Hydroxafine, Aspirlow, Paxil, Synthroid, Flonase, Zoloft, Ibuprofen, and that Plaintiff had been on Resulin for diabetes but was currently off of diabetic medication. (R. 149). Plaintiff attending counseling at Lower West Side Counseling, where she met with a counselor every 10 days, and with a psychiatrist every six weeks. (R. 149). Plaintiff's chief complaints included back pain, depression, irritability, nervousness, and daily panic attacks. (R. 149). Although Plaintiff denied any history of suicide attempts, she reported "fleeting suicidal ideation" which Plaintiff dealt with by changing her thoughts. (R. 149). Plaintiff further reported that at times she was angry with others and would break things, although she had no history of acting violently toward others. (R. 149). Plaintiff asserted she was unable to work because of her back condition and her depression. (R. 149).

Upon conducting a mental status examination, Dr. Butensky reported that Plaintiff was a 39–year old married Hispanic female who appeared her stated age, was neatly dressed and groomed in attire appropriate for the season, and demonstrated good attention to personal hygiene. (R. 150). Plaintiff was oriented in all spheres and knew the month, date and year, and the current United States President, but could not name the day of the week, nor could she identify the Mayor of Buffalo or the Governor of New York. (R. 150). While Plaintiff's memory seemed intact for remote events, Dr. Butensky found difficulty with short term memory and sustained focused attention and concentration. (R. 150). Plaintiff reported shrieking when frustrated, believed people were following her, she was careful and distrustful of people she did not know, had frequent panic attacks, and was intolerant of being alone, being in rooms with closed doors or in areas with crowds of people. (R. 150). Dr. Butensky reported Plaintiff's affect was "quite anxious and depressed," noting that Plaintiff reported having an anxious and nervous mood much of the time, her mood was up and down much of the day, she had decreased sleep, and needed to nap throughout the day. (R. 150). Plaintiff, who stood 5 feet, 5 inches, weighed 207 pounds, which included a recent 24 pound weight gain which Plaintiff attributed to an increased appetite. (R. 150). According to Dr. Butensky, Plaintiff's insight and judgment were fair and she did not appear to understand the nature of her psychological difficulties very well, although she was cooperative with her treatment. (R. 150). When asked about her

plans for the future, Plaintiff stated, "I don't know." (R. 150).

As to Plaintiff's "functional description/assessment," Dr. Butensky noted Plaintiff reports "being in a bad mood, sitting around much of the day, rearranging her clothes and checking on doors frequently, and occasionally was able to cook, wash dishes and do the laundry." (R. 150). Plaintiff went grocery shopping with her husband who manages their household finances. (R. 150). Plaintiff enjoyed word-finding puzzles, and reported always being home, having few friends, attending church and being somewhat isolated. (R. 150).

Dr. Buutenzky's diagnosis was major depression with psychotic features, panic disorder with agoraphobia and obsessive-compulsive disorder and recommended Plaintiff continue with her psychological treatment. (R. 151). Plaintiff's prognosis was guarded as Plaintiff "has been in treatment for a while and continues to be significantly depressed and anxious." (R. 151). Dr. Butensky reported that Plaintiff "might benefit from a more intensive treatment program, though it would be necessary to find one with Spanish speaking personnel." (R. 151). Dr. Butensky further opined that

> it is unrealistic to expect [Plaintiff] to be competitively employed at this point in time. Currently her psychological impairment is too severe to enable her to be engaged in gainful employment. She has difficulty leaving her home and is intolerant of being around crowds of people. If her symptoms of anxiety and depression can be brought under better control, then she would need to be evaluated for work skills, as she has only done cleaning work, and perhaps VESID could obtain a job that would not require English language skills, although she certainly would benefit from

some type of intensive English language program.

(R. 151).

On a Daily Activities Questionnaire Plaintiff completed on April 21, 1999, in support of her disability benefits application, Plaintiff reported she lived with her husband who assisted her with grocery shopping and cooking. (R. 127). Plaintiff did household chores, watched television, listened to music, read the Bible, attended church three times a week and visited her sister once a week. (R. 127). Because Plaintiff did not drive, she used public transportation, including buses, to go places, but was always accompanied by her husband and never went out alone. (R. 128). Plaintiff did not know how to manage money and her husband paid the bills. (R. 128). Plaintiff reported her only employment was as a cleaning lady/child care provider for a family, a job she worked from 1984 to 1985 when back pain and nervousness caused her to stop working. (R. 128).

On a Psychiatric Review Technique form completed on May 12, 1999, on a consultative basis by review psychologist Madan Mohan, Ph.D. ("Dr.Mohan"), Plaintiff was assessed as having affective disorders and anxiety related disorders. (R. 247–55). Specifically, Plaintiff was assessed as having disturbance of mood accompanied by full or partial manic or depressive syndrome, as evidenced by major depression and psychotic features. (R. 250). Plaintiff's anxiety related disorder was described as a panic disorder with agoraphobia and obsessive-compulsive disorder. (R. 251). Because of her mental health issues, Plaintiff was slightly limited as to her activities of daily living and ability to maintain social functioning, and often experienced deficiencies of concentration, persistence, and pace resulting in the failure to complete tasks in a timely manner,

in work settings or elsewhere. (R. 254). Plaintiff had not, however, experienced any episodes of deterioration or decompensation in work or work-like settings. (R. 254). Despite Plaintiff's anxiety-related disorder, her symptoms did not result in a complete inability to function independently outside her home. (R. 255).

Plaintiff's disability benefits application was denied on May 14, 1999, on the basis that although Plaintiff claimed to be disabled by depression, diabetes and a thyroid disorder, the medical evidence established that Plaintiff has only had "some difficulty" with stressful situations and the ability to care for her needs, and Plaintiff's examination findings were "near normal." (R. 75–79). Plaintiff filed a request for reconsideration on July 8, 1999, asserting she was then being treated for insomnia and depression, and back, shoulder and leg problems. (R. 80–81). On a Reconsideration Disability Report form completed in connection with her request for reconsideration, Plaintiff stated that her condition had worsened since initially filing her claim, including that she cannot sleep, had more pain in her shoulder, low back, neck and both legs, and that attending to her personal needs caused pain in her shoulder and back. (R. 130–35).

On July 11, 1999, Dr. Cartagena reported that Plaintiff "feels calmer, less irritable, less depressed, but [is] oversedated." (R. 227). Dr. Cartegena further noted that Plaintiff was experiencing daytime hypersomnolence (excessive sleepiness) as a side-effect of Zoloft, and recommended Plaintiff take Zoloft only in the evening. (R. 227). As of July 16, 1999, Dr. Cartage-na rated Plaintiff's Global Assessment of Functioning ("GAF") at 50.[5] (R. 230). On July 20, 1999, Dr. Cartagena reported Plaintiff continued to have anger and depression issues. (R. 223). With regard to social interaction, Plaintiff continued to have problems with anger control and conflicts, but demonstrated an ability to manage her behavior. (R. 224). Dr. Cartagena reported Plaintiff was able to perform activities of daily living and Dr. Cartagena was unaware of any known difficulties regarding Plaintiff's ability to function in a work setting. (R. 225).

On July 15, 1999, NLS staff paralegal Bruce Caufield was appointed to represent Plaintiff with regard to Plaintiff's disability benefits application. (R. 38–39).

Dr. Mohan's consultative assessment of May 12, 1999, was affirmed on August 18, 1999, by a review physician, psychiatrist Hillary Tzetzo, M.D. ("Dr.Tzetzo"), who noted that in July 1999, Dr. Cartagena reported Plaintiff's medication resulted in Plaintiff being "calmer, less irritable, less depressed," (R. 247 (referring to Dr. Cartagena's July 11, 1999 report that Plaintiff "feels calmer, less irritable, less depressed, but oversedated.")). Dr. Tzetzo, however, failed to comment on Dr. Cartagena's further recommendation that Plaintiff take Zoloft only in the evening so as "to avoid hypersomnolence." (R. 227).

On March 11, 2000, Dr. Hernandez completed an SSA form in connection with Plaintiff's disability benefits application entitled "Medical Source Statement of Ability to do Work–Related Activities (Mental)." (R. 257–61). Dr. Hernandez

---

5. The Global Assessment of Functioning ("GAF") Scale is a rating for reporting the clinician's judgment of the patient's overall level of functioning and carrying out activities of daily living. The GAF score is measured on a scale of 0–100, with a higher number associated with higher functioning. A GAF score of 50 indicates "[s]erious symptoms OR any serious impairment in social, occupational, or school functioning." GLOBAL ASSESSMENT OF FUNCTIONING, *available at* http://en.wikipedia.org/wiki/Global Assessment of Functioning.

rated as "good" Plaintiff's ability to remember locations and work-like procedures, understand and remember short, simple or detailed instructions, carry out simple or detailed instructions, sustain an ordinary routine without special supervision, make simple work-related decisions, or to ask simple questions or request assistance. (R. 258–59). Plaintiff's ability to interact appropriately with the public was rated as "fair." (R. 259). Dr. Hernandez, however, was unable to rate Plaintiff's ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual, work with or near others without being distracted by them, complete a normal workday or workweek, perform at a consistent pace, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers and peers, maintain socially acceptable behavior, adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, or set realistic goals or make plans independently of others. (R. 258–59). Dr. Hernandez noted that Plaintiff was about to undergo a vocational program assessment at Lower West Side Counseling to obtain more information regarding Plaintiff's abilities in these areas. (R. 259).

In a letter to NLS Staff Paralegal Caufield, dated May 3, 2000, Marie E. Hochreiter, CRC/CVE, a Vocational Rehabilitation Counselor with Lake Shore's Work Experience Center ("Lake Shore WEC"), explained that on March 23, 2000, Plaintiff, whose depression rendered her eligible for Lake Shore WEC's services, was referred by her mental health treatment program to Lake Shore WEC "for possible educational or vocational services leading towards [sic] a return to employment," and began the vocational assessment program on April 3, 2000. (R. 296). Initial reports indicated Plaintiff was a "well motivated" and "cooperative individual willing to attempt any given assignment," and Plaintiff, upon completing the evaluation program on May 5, 2000, would be further evaluated to determine whether additional vocational training was required or whether Plaintiff was ready to pursue supported employment. (R. 296).

On May 10, 2000, Lake Shore Clerical Vocational Specialist Geraldine Lake ("Lake"), who supervised Plaintiff at Lake Shore WEC's Vocational Services, a sheltered program for clients with mental disabilities, and in which Plaintiff had participated since April 3, 2000, explained that the program provided training for clerical entry-level skills in a stress free environment. (R. 297). During the 20–day evaluation which began on April 3, 2000, Lake had observed Plaintiff "struggle with frustration" when learning a computer software program as well as with receptionist skills, including filing, using a calculator, and typing letters, memos, envelops and other related clerical skills. (R. 297). According to Lake, Plaintiff "exhibits a phobia about answering phones and refuses to answer them," and "would not be able to work in any stressful work environment." Lake had further observed Plaintiff become "very angry as well as frustrated" when working on the computer, which caused Plaintiff to "raise[ ] her hands above her head and was very agitated and angry." (R. 297).

On May 9, 2000, Dr. Hernandez completed a treating physician's report at the request of NLS Staff Paralegal Caufield. (R. 290–95). Dr. Hernandez diagnosed Plaintiff with an Affective Disorder, specifically, Depressive Syndrome, which was manifested by occasional anhedonia, appetite disturbance with change in weight,

sleep disturbance, decreased energy, and feelings of worthlessness. (R. 290). Plaintiff's personality disorder manifested itself in a "pathological" dependence on her husband, who has assumed responsibility for Plaintiff's medical care, getting Plaintiff out of bed, keeping appointments and attending programs. (R. 291, 293). Several of Plaintiff's activities of daily living were restricted by her pathological dependency on her husband, including her ability to shop and pay bills, and Plaintiff "often attends appointments only at her husband's insistence." (R. 291). Plaintiff experienced difficulties in maintaining social functioning, including getting along with family, friends and neighbors, given that Plaintiff tended to isolate herself and exhibited anger, did not engage in socializing, preferring to be alone, and had difficulty displaying awareness as to others' feelings and establishing interpersonal relationships as Plaintiff would often act out in anger when her own desires were not fulfilled, upon her demand, by others. (R. 291–92). Plaintiff's inability to function independently, and her need for "much support and assistance," hampered her task performance and concentration abilities. (R. 292). Although Plaintiff was "stable" with regard to her functioning at Lake Shore's vocational program, where Plaintiff had a "good deal" of support and supervision, it was unknown whether Plaintiff would continue to function at the same level in a competitive work environment, but it was "likely" that Plaintiff would "decompensate" in such situation. (R. 292). Plaintiff, in stressful circumstances and in work or work-like settings, had withdrawn from situations, displayed anger and had superficially or inappropriately interacted with her peers by isolating herself. (R. 292). Plaintiff also had diffi-culty initiating and motivating herself. (R. 293). Plaintiff's psychiatric impairment was expected to last for several years given her limited progress so far, and Plaintiff also had a borderline narcissistic personality characterized by an unrealistic expectation that others would automatically comply with her expectations. (R. 293). With treatment, Plaintiff's GAF score as of May 2000 had only improved to 60.[6](R. 294). Plaintiff continued to be diagnosed with dysthmic disorder and personality order not otherwise specified. (R. 294).

At the administrative hearing held on May 11, 2000, Plaintiff, represented by Caufield, gave testimony with the assistance of Spanish interpreter and translator Amy Laura ("Laura"). A vocational expert, psychologist Timothy P. Janikowski, Ph.D., C.R.C. ("Dr.Janikowski"), also testified. (R. 40–72). Plaintiff, then 40 years old, testified, through Laura, the Spanish interpreter and translator, in response to the ALJ's questions that she was educated in Puerto Rico where she attended school to the ninth grade, and received a graduate equivalency degree in 1987. (R. 48). Plaintiff's only work experience was in Puerto Rico in 1984 and 1985 as a housekeeper. (R. 48–49). Plaintiff initially came to the United States in 1991 and stayed until 1992 when she returned to Puerto Rico before permanently relocating to the United States on November 2, 1994. (R. 49). Plaintiff testified that she was disabled by neck pain and depression, and described her depression as preventing her from getting dressed and leaving her home, and that Plaintiff would isolate herself by closing and locking all the doors and windows. (R. 50). At that time, Plaintiff's medications included aspirin,

---

**6.** A GAF score of 60 indicates "[m]oderate symptoms OR any moderate difficulty in social occupational, or school functioning." GLOBAL ASSESSMENT OF FUNCTIONING, *available at* http://en.wikipedia.org/wiki/Global—Assessment—of—Functioning.

Glucophage for diabetes, Prevacid for indigestion, Synthroid for hypothyroidism, Allegra D, Azmacort, Albuterol and Flonase for asthma, Vioxx and Ibuprofen for pain, Zoloft, Hydroxyzine and Trazodone both for sleep and as a relaxant. (R. 50–53). Plaintiff explained she used to see Dr. Cartagena for counseling at Lake Shore, but that she currently saw Dr. Hernandez at Lake Shore as Dr. Cartagena was no longer associated with Lake Shore. (R. 53–54).

After the ALJ concluded his questioning, Plaintiff testified in response to questions by Caufield that despite her medication, on average she was too depressed to bathe and dress, and locked herself inside her home two or three days a week. (R. 54–55). Plaintiff testified that she had trouble controlling her temper, explaining that she would get angry if someone commanded her to do something, gave her directions, or tried to control her. (R. 55). Plaintiff continued that she did not like anyone to talk to her "too much." (R. 55). Plaintiff had been attending a job training program for about a month, but she had lost her temper on three occasions, including when her teacher accused Plaintiff of not greeting her, and when she had trouble learning to use the computer. (R. 56–57). Plaintiff explained that pain in her neck and left elbow interfered with her use of the computer. (R. 57). According to Plaintiff, who is left-hand dominant, she had constant left elbow pain and swelling which prevented her from lifting heavy bags. (R. 57–58). Plaintiff stated that she was afraid to leave her apartment by herself, but could not explain the reason for such fear, and that she had missed attending her job training program two or three times for sickness, and other times for appointments. (R. 58–59). Plaintiff also testified that when she left her apartment, she often felt like she was being followed. (R. 59). Plaintiff liked to count things,

such as the number of stairs in a staircase or the number of tiles on a ceiling, but was unable to explain why she delighted in such pastimes. (R. 59).

Upon reeaxmination by the ALJ, Plaintiff testified that she lost her temper at her job training program when she became frustrated trying to learn how to operate a computer and she could not understand English. (R. 60). Plaintiff stated she had attempted to sign up for English classes offered through the public assistance office, but that she was not accepted for classes through that office. (R. 60–61).

After Plaintiff's testimony was completed, the ALJ called Dr. Janikowski who testified as an impartial vocational expert. (R. 62). The ALJ posed to Dr. Janikowski as a hypothetical an individual of younger age, with a graduate equivalency diploma, whose exertional capacities were limited to sitting, standing or walking up to eight hours in a day, frequently lifting up to 25 pounds, occasionally lifting 50 pounds, and whose non-exertional capacities were moderately restricted as to understanding, remembering, and carrying out complex and detailed instructions, sustaining attention and concentration for extended periods, interacting with the public, co-workers and supervisors, and adapting to changes in the workplace environment. (R. 63–64). Dr. Janikowski responded that such an individual could perform four jobs, including maid or housekeeper, hand-packager, machine feeder/offbearer and laundry worker, and that a sufficient number of each such job existed in the Western New York area. (R. 65).

Plaintiff's representative, Caufield, modified the hypothetical posed to Dr. Janikowski to include that the individual would miss work two to three times per month. (R. 67). Dr. Janikowski responded that such absenteeism would generally not be

tolerated by an employer and would likely lead to the employee's dismissal. (R. 67). Caufield further modified the hypothetical to provide that the individual occasionally would refuse to accept a supervisor's constructive criticism or direction. (R. 67). Dr. Janikowski responded that such a limitation would be "problematic" as Plaintiff would be expected "to take a subservient role and directions, even if she doesn't agree with those directions," and that refusing to accept a supervisor's direction was likely to result in termination of employment. (R. 67–68). Dr. Janikowski acknowledged that Plaintiff's inability to speak or to comprehend English could interfere with her learning a job, but that once she learned the routine of a specific unskilled job, Plaintiff's lack of English would not render her unemployable. (R. 68). In response to reexamination by the ALJ, Dr. Janikowski explained that often there is someone on staff at an unskilled job who is bilingual and who is able to train new employees who are not fluent in English. (R. 69). Dr. Janikowski was then reexamined by Caufield who inquired as to the impact an individual's need to remove herself from work, in addition to regularly scheduled breaks, more than once a week, or to leave work early, arrive late, or to fail to complete tasks more than once a month would have on the individual's job. (R. 69–70). Dr. Janikowski replied that from an operational perspective, such work interruptions were likely to cause the individual to be fired. (R. 70).

On a Medical Assessment of Ability to do Work–Related Activities (Mental) completed by Lake Shore Clerical Vocational Specialist Lake on May 24, 2000, Plaintiff was found to have limitations as to several mental abilities and aptitudes necessary for performing unskilled work. (R. 300–01). In particular, Plaintiff was rated as "unlimited/very good" as to maintaining regular attendance and being punctual within customary tolerances of regular employment in the competitive labor market, sustaining an ordinary routine without special supervision, and working in coordination with or proximity to others without being unduly distracted. (R. 301). Plaintiff's abilities to maintain attention for extended periods, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, and to respond appropriately to changes in a routine work setting were rated as "good." (R. 301–02).[7] However, Plaintiff was rated as "fair" with regard to remembering work-like procedures, understanding, remembering and carrying out very short and simple instructions, making simple work-related decisions, and completing a normal work day and work week without interruptions from her psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, and getting along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes. (R. 301). A key on the form defines an "unlimited or very good" ability as "more than satisfactory;" a "good" ability as "limited but satisfactory;" and a "fair" ability as "seriously limited, but not precluded." (R. 301). Lake commented that Plaintiff became frustrated when learning new skills, refused to use the telephone, that Plaintiff's lack of English was "a problem," and that Plaintiff often complained of back pain when using a computer for any length of time. (R. 302).

---

**7.** Page 302 of the Administrative Record is found in the Answer Supplement (Doc. No. 11).

On July 28, 2000, the ALJ issued his decision denying Plaintiff's disability benefits application. (R. 19–27). On August 17, 2000, Plaintiff requested the Appeals Council review the hearing decision. (R. 17–18). In support of the requested review, Caufield, by letter dated February 6, 2002, summarized Plaintiff's challenges to the ALJ's decision. (R. 12–15). Plaintiff subsequently submitted additional evidence concerning her request for review, including a letter dated April 9, 2002 from Plaintiff's treating psychiatrist, Dr. Hernandez. (R. 308–09).

Specifically, in the April 9, 2002 letter to NLS, Dr. Hernandez wrote that Plaintiff has been receiving treatment since December 1998, was currently diagnosed with Major Depressive Disorder characterized by chronic depressed mood, blunted affect, chronic feelings of worthlessness, difficulty concentrating, poor sleep without medication, and increased appetite, was also diagnosed with Dependent Personality, and exhibited features of Borderline and Narcissistic Disorders. (R. 308). Dr. Hernandez also found that Plaintiff had made little progress in treatment and remains "well-defended, using the intellectualization of her symptoms to avoid issues of anger that stem from severe childhood physical abuse and emotional deprivation-what the client [Plaintiff] sees as the sources of her anger and depression." (R. 308). Despite Plaintiff's inability to resolve her issues in sessions, Dr. Hernandez determined that Plaintiff had good insight into the issues, as well as into her need to "self-punish, acting-out the rage by periodically refusing to follow through with administering daily insulin." (R. 308). At times Plaintiff isolates herself in her room or remains in bed all day and, despite Plaintiff's insight into her issues, Plaintiff "has been unable to change any coping skills, either decreasing negative behaviors as described, or implementing positive behaviors to begin to alleviate the depression and anger." (R. 308). Plaintiff attributed her lack of progress to "chronic feelings of hopelessness and passive suicidal ideation." (R. 308). According to Dr. Hernandez, Plaintiff "has not returned to our [Lower West Side Counseling] vocational program due to these symptoms and physical problems." (R. 308). Dr. Hernandez continued that Plaintiff "expects that others will meet her emotional needs. She therefore has much difficulty responding to authority figures appropriately when they relate to her in other than a nurturing way. She reports acting-out anger when [she] feels any demand is place on her, or when she feels criticized." (R. 308).

In light of Plaintiff's recently submitted evidence, however, the Appeals Council, on July 26, 2002, vacated its May 14, 2002 decision denying Plaintiff's request for review. (R. 5–7, 8). Upon reconsidering the review request, including Dr. Hernandez's April 9, 2002 letter, the Appeals Council, on July 26, 2002, found no basis for granting the review and denied the request. (R. 5–7, 8).

## DISCUSSION

### Disability Determination Under the Social Security Act

■ An individual is entitled to disability insurance benefits under the Social Security Act if the individual is unable

> ... to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.... An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such

severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

42 U.S.C. §§ 423(d)(1)(A) & 423(d)(2)(A), and 1382c(a)(3)(A) & 1382c(a)(3)(C)(i). Once the claimant proves that he is severely impaired and is unable to perform any past relevant work, the burden shifts to the Commissioner to prove that there is alternative employment in the national economy suitable to the claimant. *Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980). "In assessing disability, the [Commissioner] must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur v. Heckler,* 722 F.2d 1033, 1037 (2d Cir.1983) (quoting *Gold v. Sec'y of H.E.W.,* 463 F.2d 38, 41 (2d Cir.1972)).

■ The standard of review for courts reviewing administrative findings regarding disability benefits, 42 U.S.C. §§ 401–34 and 1381–85, is whether the administrative law judge's findings are supported by substantial evidence. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Substantial evidence requires enough evidence that a reasonable person would "accept as adequate to support a conclusion." *Consolidated Edison Co. v. National Labor Relations Board,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938).

■ When the Commissioner is evaluating a claim, the Commissioner must consider "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability (testified to by the claimant and others), and ... educational background, age and work experience." *Dumas v. Schweiker,* 712 F.2d 1545, 1550 (2d Cir. 1983) (quoting *Miles v. Harris,* 645 F.2d 122, 124 (2d Cir.1981)). If the opinion of the treating physician is supported by medically acceptable techniques and results from frequent examinations, and the opinion supports the administrative record, the treating physician's opinion will be given controlling weight.[8] *Schisler v. Sullivan,* 3 F.3d 563, 567 (2d Cir.1993); 20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d). The Commissioner's final determination will be affirmed, absent legal error, if it is supported by substantial evidence. *Dumas v. Schweiker, supra,* at 1550; 42 U.S.C. § 405(g); 42 U.S.C. § 1383(c)(3). "Congress has instructed ... that the factual findings of the [Commissioner],[9] if supported by substantial evidence, shall be conclusive." *Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

The federal regulations set forth a five-step inquiry by which the Commissioner evaluates a claim for disability insurance benefits. 20 C.F.R. §§ 404.1520, 416.920. *See Brown v. Apfel,* 174 F.3d 59, 62 (2d Cir.1999) (citing *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996)).

---

8. The treating physician's opinion is given greater weight because of the "continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient." *Mongeur v. Heckler,* 722 F.2d 1033, 1039 n. 2 (2d Cir. 1983).

9. Pursuant to § 106 of the Social Security Independence and Program Improvements Act of 1994, the function of the Secretary of Health and Human Services in Social Security cases was transferred to the Commissioner of Social Security, effective March 31, 1995. In accordance with § 106(d) of that Act, references to "the Secretary" have been replaced with "the Commissioner."

The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a 'severe impairment' that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform [his] past relevant work. Finally, if the claimant is unable to perform [his] past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies [his] burden of proving the requirements in the first four steps, the burden shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Brown, supra,* at 62 (quoting *Perez, supra,* at 46). In reviewing the administrative finding, the court must follow this five-step analysis to determine if there was substantial evidence on which the Commissioner based her decision. *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

■ Here, it is undisputed that Plaintiff is not presently employed, nor has Plaintiff engaged in substantial gainful employment since 1994. (R. 31); Plaintiff's Memorandum at 11–12. Nor do the parties dispute that although Plaintiff's depression, orthopedic, endocrine and mental health limitations are "severe" insofar as they significantly limit Plaintiff's capacity for basic work activities, Plaintiff's medical impairments, neither individually nor in combination, meet or are equal to the required criteria of any impairment listed in Appendix 1, Subpart P, Regulation No. 4 ("the Listing of Impairments."). (R. 31); Defendant's Memorandum at 17–18; Plaintiff's Memorandum at 12. The parties also concur with the ALJ's determination that Plaintiff has no relevant past work experience. (R. 30); Defendant's Memorandum at 29; Plaintiff's Memorandum at 12. Nevertheless, the parties dispute the ALJ's determination that Plaintiff, despite her severe medical impairments, including her psychological symptoms and impairments, retains the residual functional capacity for work.

In the instant case, based on its review of the record, the court finds the ALJ's determination that Plaintiff is not disabled violated the treating physician rule as the ALJ's reasons for rejecting the opinions rendered by Plaintiff's treating physician are not supported by substantial evidence in the record. *See Diaz v. Shalala,* 59 F.3d 307, 313 (2d Cir.1995) (Commissioner need not give controlling weight to treating physician's opinion it the opinion is not supported by substantial evidence in the record). Generally, the Secretary grants the opinion of a treating physician controlling weight only if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence.[10] *Diaz, supra,* at 313; *Schisler v. Sullivan,* 3 F.3d 563, 567 (2d Cir.1993); 20

---

10. Deference is given to the opinions of treating physicians based on the belief that opinions formed as the result of an ongoing physician-patient relationship are more reliable than opinions based solely on examination for the purposes of disability proceedings. *See Schisler v. Sullivan, supra,* at 568.

C.F.R. § 416.927(d). The ALJ is required to give controlling weight to a "treating source's opinion on the issues(s) of the nature and severity of your impairment(s)" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in your case record," 20 C.F.R. § 416.927(d)(2), and provided the treating source's opinion is "a medical opinion under this provision's controlling weight rule." *Diaz v. Shalala,* 59 F.3d 307, 313 (2d Cir.1995). As relevant, 20 C.F.R. § 416.913(a) defines "medical sources," as relevant to the instant case, as including only licensed physicians and licensed or certified psychologists. 20 C.F.R. § 416.913(a)(1) and (2). Furthermore, the ALJ "cannot arbitrarily substitute his own judgment for competent medical opinion." *Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir.1999).

■ "When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling." *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir.1999). Also, some determinations, including the ultimate finding of disability, are specifically "reserved to the Commissioner." *Snell, supra* (quoting 20 C.F.R. § 404.1527(e)(1)); *see also* 20 C.F.R. § 416.927(e)(1). A treating physician's statement that a claimant is disabled is, therefore, not determinative by itself. *Snell, supra.* Nevertheless, the regulations require an explanation of the weight given a treating physician's opinion and the failure to provide "good reason" for not crediting such an opinion is a ground for remand. *Snell, supra* (citing *Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir.1998)). Thus, although the ultimate issue of disability is reserved to the Commissioner, relieving the Commissioner of having to credit a treating physician's finding of dis-

ability, the administrative decisionmaker is not relieved from the obligation under §§ 404.1527(d)(2) and § 416.927(d)(2), and *Schaal,* to explain *why* a treating physician's opinion is *not* credited. *Snell, supra,* at 134. Further, the ALJ's duty to develop the record extends to that necessary to reconcile inconsistencies and gaps in the record concerning the reports of treating physicians. *Rosa, supra,* at 78.

Here, Plaintiff has been under psychiatric care since December 17, 1998 when she began treatment at Lake Shore upon referral from her primary physician at Niagara Family. (R. 231–34, 294). On March 11, 2000, Dr. Hernandez, who succeeded Dr. Cartegena as Plaintiff's treating psychiatrist at Lake Shore, reported that she was unable to rate many of Plaintiff's work-related abilities, including maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, being punctual, working with or near others without being distracted by them, completing a normal workday or workweek, performing at a consistent pace, accepting instructions, responding appropriately to criticism from supervisors, getting along with co-workers and peers, maintaining socially acceptable behavior, adhering to basic standards of neatness and cleanliness, responding appropriately to changes in the work setting, being aware of and taking appropriate precautions as to normal hazards, traveling in unfamiliar places, using public transportation, setting realistic goals, or making plans independently of others. (R. 258–59). Although Dr. Hernandez was unable to rate the above work-related abilities, significantly, on May 9, 2000, Dr. Hernandez opined that Plaintiff was "likely" to "decompensate" in a competitive work environment. (R. 292). Dr. Hernandez further explained on May 9, 2000 that Plaintiff's personality disorder manifested itself in a "pathological" depen-

dence on her husband, who had assumed responsibility for Plaintiff's medical care, including getting Plaintiff out of bed to keep appointments and attend programs, which Plaintiff often did only at her husband's "insistence," (R. 291, 293), that Plaintiff's activities of daily living were restricted by such pathological dependence (R. 291), that Plaintiff tended to isolate herself and had anger outbursts when her desires were not met on demand (R. 291–92), and that Plaintiff had difficulty motivating or initiating herself. (R. 293). Moreover, although on March 11, 2000, Dr. Hernandez explained that Plaintiff had recently began attending a vocational program at Lower West Side Counseling where more information regarding Plaintiff's abilities in these areas would be obtained, (R. 258–59), in her letter dated April 9, 2002, written after the ALJ's hearing decision, but before the Appeals Council had acted on Plaintiff's request for review of the hearing decision, Dr. Hernandez, along with Certified Social Worker Carmen Valls, Plaintiff's Lake Shore counselor, wrote that Plaintiff's continuing psychological problems caused Plaintiff to cease attending her vocational training program. (R. 308).

Dr. Hernandez also wrote on April 9, 2002 that Plaintiff continued to be diagnosed with Major Depressive Disorder, with chronic, depressed mood, flat affect, chronic feelings of worthlessness, difficulty concentrating, poor sleep without medication, and increased appetite, that Plaintiff's psychiatric condition also met the criteria for Dependent Personality, and Plaintiff exhibited features of Borderline and Narcissistic Disorders. (R. 308). Since 1998, Plaintiff had made little progress in treatment, continuing to intellectualize her symptoms to avoid anger issues. (R. 308). Dr. Hernandez particularly mentioned Plaintiff's lack of coping skills, including her inability to decrease negative

behaviors, or to implement any positive behaviors to alleviate her depression and anger, her need to self-punish and to act out rage by periodically refusing to follow through with administering her daily insulin, and Plaintiff's tendency to isolate herself in her room on to remain in bed all day. (R. 308). Plaintiff's feelings of hopelessness and passive suicidal ideation were "chronic," and Plaintiff expected others to meet her emotional needs, thereby making it difficult for Plaintiff to respond appropriately to authority figures "when they relate to her in other than a nurturing way," often acting out in anger. (R. 308).

Dr. Hernandez's medical opinion of May 9, 2000, that Plaintiff's psychological symptoms would "likely" cause Plaintiff to "decompensate" in a competitive work setting (R. 292) is consistent with Lake Shore Clerical Vocational Specialist Lake's May 10, 2000 letter in which Lake reported Plaintiff's inability "to work in any stressful environment," based on Lake's repeated observations of Plaintiff's frustration when trying to learn to use a computer and receptionist skills, and Plaintiff's telephone phobia. (R. 297). Dr. Hernandez's medical opinion is also consistent with Dr. Butensky's finding upon examining Plaintiff, on a consultative basis on behalf of the SSA, that

> it is unrealistic to expect [Plaintiff] to be competitively employed at this point in time. Currently her psychological impairment is too severe to enable her to be engaged in gainful employment. She has difficulty leaving her home and is intolerant of being around crowds of people.

(R. 151).

The ALJ failed to give controlling weight to Dr. Hernandez's opinion regarding Plaintiff's inability to work on the basis that while Dr. Hernandez opined that

Plaintiff has "marked difficulties" in several areas, particularly in maintaining social functioning, Dr. Hernandez "did not render an actual opinion on [Plaintiff's] ability to work, stating 'It is unknown how [Plaintiff] would do in a competitive work setting.'" (R. 29). The ALJ further observed that many of Dr. Hernandez's assessments as to Plaintiff's work-related abilities were prefaced by such comments as "[Plaintiff] reports," thereby clarifying that Dr. Hernandez was not providing her own assessment of Plaintiff's abilities, "but merely recited the limitations reported by [Plaintiff]." (R. 29).

Although the ALJ explains his reasons for not giving controlling weight to the opinion of Dr. Hernandez, Plaintiff's treating psychiatrist, as required, *Snell, supra,* at 134, the ALJ's determination that Dr. Hernandez was "merely reciting the limitations" as reported by Plaintiff ignores the fact that Plaintiff had been receiving psychiatric care provided by either Dr. Cartagena or Dr. Hernandez at Lake Shore since December 1998, approximately 16 months prior to the hearing before the ALJ and, as such, these physicians must have assessed Plaintiff on some basis other than only Plaintiff's own complaints. For example, Dr. Hernandez's statement in her May 9, 2000 assessment that Plaintiff's current psychiatric signs and symptoms were expected to last for several years given that her "progress in treatment has been limited thus far," establishes that Dr. Hernandez was sufficiently aware of Plaintiff's mental history so as to opine that Plaintiff's mental health condition as of May 9, 2000 did not significantly differ from her mental health condition upon commencing mental health services at Lake Shore in December 1998. (R. 290–95). Furthermore, as stated, in a May 9, 2000 report, Dr. Hernandez opined that Plaintiff's continuing psychological symptoms were "likely" to cause her to "decom-

pensate" in a competitive work setting. (R. 292).

Of further significance is the absence of any comment by anyone from whom Plaintiff received mental health treatment calling into question Plaintiff's credibility in reporting her psychological symptoms and impairments. Rather, upon referral to Lake Shore's WEC on March 23, 2000 for a vocational assessment program commencing on April 3, 2000, Ms. Hochreiter, the Vocational Rehabilitation Counselor, stated that Plaintiff's initial reports indicated Plaintiff was "well motivated" and a "cooperative individual willing to attempt any given assignment." (R. 296). In contrast, Ms. Lake, Lake Shore Clerical Vocational Specialist, upon performing Plaintiff's 20–day evaluation at WEC, commencing on April 3, 2000, observed Plaintiff's frequent frustration and anger displays when using the computer and performing receptionist skills, and that a phobia prevented Plaintiff from answering telephones. (R. 297). That the record does not contain any further evaluation, as Ms. Hochreiter anticipated would be conducted following the completion of the 20–day assessment (*see* R. 296), is consistent with Dr. Hernandez's report of April 9, 2002, that Plaintiff's psychological issues caused her to cease attending the vocational training program. (R. 308).

Significantly, the Commissioner does not dispute Dr. Hernandez's opinion that in a competitive work environment Plaintiff is "likely" to "decompensate." R. 292. As used by psychiatrists and psychologists, the term "decompensate" refers to the inability to respond to one's personality disturbance or psychological imbalance, particularly the "decreasing ability to think and carry on daily activities," as a result of a mental illness. *See* http://en.wikipedia.org/wiki/Decompensation. Thus, by stating that Plaintiff, if required to

engage in a competitive work environment, was "likely" to "decompensate," Dr. Hernandez opined that such work environment would likely cause Plaintiff to (i) manifest her pathological dependence upon her husband, thereby restricting her daily functioning, (ii) engage in acts of self-isolation and angry outbursts when her desires were not immediately met, and (iii) experience difficulty in exercising self-motivation and initiative. Nowhere does the ALJ seek to explain how Plaintiff could reasonably be expected to perform productive work in any sort of employment given Dr. Hernandez's conclusion that, based on Dr. Hernandez's diagnosis that Plaintiff suffers from a major depressive disorder with chronic feelings of hopelessness and mild suicidal ideation rendering her incapable of performing such gainful employment, engaging in such employment is likely to cause Plaintiff to "decompensate." If the ALJ believed, a finding not apparent in the record, that notwithstanding Dr. Hernandez's psychiatric evaluation of Plaintiff, including her capacity for productive employment, Plaintiff could nevertheless reasonably be expected to perform satisfactorily in a non-competitive form of employment, the record is without substantial evidence to support any such conclusion.

The ALJ's reasons for failing to give controlling weight to Dr. Hernandez's findings describing the effect of Plaintiff's psychological symptoms and condition on her capacity to perform work-related activities so as to engage in substantial gainful employment are, thus, not supported by the record. Moreover, the ALJ further violated the treating physician rule by failing to point to any evidence contradicting Dr. Hernandez's opinion that Plaintiff is "likely" to "decompensate" in a competitive work setting.

Moreover, given the evidence in the instant case that Plaintiff left her home and attended appointments only with her husband's assistance and at her husband's "insistence" (R. 127–28, 291), is "pathologically dependent" on her husband (R. 291), and preferred to be alone, often isolating herself in her home with the doors and windows shut and locked (R. 50, 291–92, 308), the ALJ, by failing to discredit Dr. Hernandez's opinion that Plaintiff was "likely" to "decompensate" in a competitive work environment, also failed to specifically find, as is the Commissioner's burden, that Plaintiff is "emotionally able" to work outside her home. *See Veino v. Barnhart*, 312 F.3d 578, 588–89 (2d Cir.2002) (holding where the record contains substantial evidence that a disability benefit applicant's mental health condition makes it "difficult" for the applicant to leave her home to go to a job, the ALJ must make a specific finding as to the applicant's "emotional ability to work away from home."). The Commissioner has thus failed to satisfy her burden of proving that Plaintiff is capable of working and, as such, the matter should be remanded for calculation of benefits.

### CONCLUSION

Based on the foregoing, Defendant's motion for judgment on the pleadings (Doc. No. 14) should be DENIED; Plaintiff's motion for judgment on the pleadings (Doc. No. 17) should be GRANTED insofar as it seeks remand for calculation of benefits, and the matter should be remanded for calculation of benefits.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the

Clerk of the Court within ten (10) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.